RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0029p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

OHIO CITIZEN ACTION,
      *Plaintiff-Appellant/Cross-Appellee,*

      *v.*

CITY OF ENGLEWOOD, an Ohio Municipal
Corporation,
      *Defendant-Appellee/Cross-Appellant.*

Nos. 10-3265/3293

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 05-00263—Walter H. Rice, District Judge.

Argued: June 9, 2011

Decided and Filed: February 2, 2012

Before: WHITE and STRANCH, Circuit Judges; COHN, Senior District Judge.[*]

_____

## COUNSEL

**ARGUED:** Daniel T. Kobil, CAPITAL UNIVERSITY LAW SCHOOL, Columbus, Ohio, for Appellant. Lynnette Dinkler, DINKLER PREGON LLC, Dayton, Ohio, for Appellee. **ON BRIEF:** Daniel T. Kobil, CAPITAL UNIVERSITY LAW SCHOOL, Columbus, Ohio, Stephen R. Felson, Robert B. Newman, Cincinnati, Ohio, Edward A. Icove, ICOVE LEGAL GROUP, LTD., Cleveland, Ohio, Ellis Jacobs, ADVOCATES FOR BASIC LEGAL EQUALITY, Dayton, Ohio, for Appellant. Lynnette Dinkler, Jamey T. Pregon, DINKLER PREGON LLC, Dayton, Ohio, for Appellee. Carrie L. Davis, AMERICAN CIVIL LIBERTIES UNION OF OHIO FOUNDATION, INC., Cleveland, Ohio, Paul D. Polidoro, Patterson, New York, Stephen L. Byron, Willoughby, Ohio, for Amici Curiae.

_____

[*]The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

_____

**OPINION**

_____

HELENE N. WHITE, Circuit Judge.  The municipality of Englewood, Ohio, passed an ordinance banning all door-to-door canvassing and soliciting between 6 P.M. and 9 A.M.  Ohio Citizen Action challenged this curfew and other provisions of the ordinance on First Amendment grounds.  The district court upheld the curfew, but found other portions of the ordinance unconstitutional.  We AFFIRM in part and REVERSE in part.

## I.  *BACKGROUND*

The facts underlying this case are not in dispute.  Ohio Citizen Action ("OCA") is a non-profit, public-interest group founded in 1975 that advocates mainly on environmental issues.  OCA describes itself as a community organization 80,000 members strong, which practices "door-to-door democracy" to promote reducing pollution in Ohio.  Members support OCA financially and by signing petitions, writing letters, making phone calls, talking to neighbors, posting yard signs, or speaking out at community meetings.   One of OCA's principal methods of organizing citizens and delivering its message is through face-to-face contact with citizens on their doorsteps. During these exchanges, OCA's canvassers typically solicit financial contributions to benefit the organization.[1]

_____

[1]The fact that OCA solicits donations for its cause does not "commercialize" the nature of its speech.  In *Village of Schaumburg v. Citizens for a Better Environment*, the Supreme Court explained that
> charitable appeals for funds, on the street or door to door, involve a variety of speech interests – communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes – that are within the protection of the First Amendment. . . . Canvassers in such contexts are necessarily more than solicitors for money.  Furthermore, because charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services, it has not been dealt with in our cases as a variety of purely commercial speech.

444 U.S. 620, 632 (1980).  This opinion refers to OCA's activities in general as "canvassing" or "noncommercial soliciting," to distinguish them from solicitations of a purely commercial nature.

Englewood (or "the City") is a northern suburb of Dayton, Ohio, with about 13,500 residents and 5,000 households.  Since at least 1921, Englewood has had a solicitation ordinance of some kind.  The ordinance initially prohibited door-to-door solicitation after sunset, but in 1983, this restriction was replaced with a 6 P.M. curfew. Violations are classified as misdemeanors punishable by a fine of up to $250 and up to 30 days' imprisonment.

In 2004, Englewood passed the ordinance in effect at the time of the events giving rise to this lawsuit ("the 2004 Ordinance").  As relevant to this case, the 2004 Ordinance required anyone desiring to "peddle, vend, solicit or request contributions for any purpose, charitable or otherwise," to obtain a license from the City, with exceptions for newspaper sellers, certain vendors of goods or services and persons under the age of 18. Englewood Codified Ordinances ("E.C.O.") § 854.03, 854.08 (2004). The licensing requirement did not apply to canvassing, defined as "the house-to-house distribution of ideas, pamphlets, literature . . . or the collection of signatures or support for any purpose or cause," so long as canvassers did not also solicit donations.  *Id*. §§ 854.01(a), 854.08(a). The 2004 Ordinance also contained a curfew provision, which prohibited "all canvassing, peddling, vending, soliciting and requests for contributions" every day of the week before 9 A.M. and after 6 P.M., "unless a later hour is approved by the City Manager for a good cause."  *Id*. § 854.11.

On April 12, 2005, OCA notified Englewood in writing of its intention to canvass the City later that day from 4 P.M. to 9 P.M., and that afternoon, members began canvassing and soliciting donations in the City.  At some point in the evening, Englewood's police chief advised OCA's canvassing director by telephone that her members were in violation of the City's curfew, but that he would allow canvassing to continue until 8 P.M.  In subsequent conversations, the City made clear its intention to strictly enforce the curfew in the future and OCA intimated that it would consider challenging the ordinance in court.

In May 2005, Englewood's City Manager submitted to the City Council a proposal to amend the 2004 Ordinance; the City Council adopted this revised ordinance ("the 2005 Ordinance") on July 12, 2005.**2**

The 2005 Ordinance kept the same licensing requirement and curfew provision as its predecessor, but rescinded the City Manager's discretionary power to grant curfew waivers for good cause. E.C.O. § 854.11 (2005). The 2005 Ordinance also included a provision requiring the City Manager to maintain a "do-not-solicit list" to which any property owner could add his or her residence. *Id*. § 854.12(a). Properties registered on this list became off limits "for the purpose of Contact Canvassing,[**3**] peddling, vending, soliciting or requesting contributions," *id*. § 854.12(b), and all persons engaged in such activities were required to obtain a copy of the list and present it when requested by City officials or residents, *id*. §§ 854.03, 854.12(a). Finally, the 2005 Ordinance prohibited anyone from "knock[ing] at the door or ring[ing] the doorbell of any residence . . . upon which is clearly displayed at the entrance a notice that reads 'NO SOLICITORS' or that

---

**2**Along with the proposed amendments, the City Manager circulated the following memorandum to members of Englewood's City Council:

> Each year the City is bombarded with various groups wishing to solicit door-to-door. Sorting out who is permitted by right (such as religious and political groups) and who just want access for all sorts of purposes (such as peddlers, beggars, lawn services) is always a challenge.
>
> One thing we do know: door-to-door solicitation is about as popular with the public as the telephone solicitation that the federal government finally stepped in to legislatively control with a "no call" list. This procedure has proven quite successful.
>
> This ordinance was prompted by an alleged environmental organization asking residents to sign a petition for their [sic] yearly cause. A donation is gladly accepted and the resident is usually pressed to provide. The "volunteers" are actually paid and the political nature of the group made it difficult to control through the City's existing permitting process. We did not prohibit their work but they took issue with the hours limiting solicitation activity. The City's existing ordinance requires all activity cease at 6:00 p.m. This is entirely constitutional according to the Law Director but, of course, the solicitors want to make contact in the evening hours when people are generally home.
>
> The attached legislation creates a local "do-not-solicit" list similar to the federal no-call telephone list. This allows personal choice if any resident prefers not to be bothered.

(R. 15-4, Smith Mem. at 1.)

**3**The 2005 Ordinance introduced a distinction between "contact canvassing" (the act of canvassing "through in person, fact-to-face [sic] contact, verbal or otherwise, with individual residents") from "non-contact canvassing" (canvassing without attempting to contact residents in person, "such as the distribution of leaflets and/or pamphlets by leaving them at a place of residence."). O.R.C. § 854.01(k)-(l) (2005). Unlike contact canvassers, non-contact canvassers were not required to obtain the do-not-solicit list and remained free to enter any property to distribute pamphlets and the like. *See id*. § 854.12(a).

otherwise clearly purports to prohibit peddlers, Contact Canvassers, vendors, solicitors, or persons requesting contributions . . . ."  *Id*. § 854.12(c).

On July 25, 2005, OCA filed this action under 42 U.S.C. § 1983, alleging that the 2004 and 2005 Ordinances violated the First and Fourteenth Amendments of the United States Constitution on their face or as applied.  Relevant to this appeal, OCA challenged the following:  (1) the 6 P.M. curfew imposed  by both ordinances; (2) the City Manager's discretion under the 2004 Ordinance to extend the curfew "for a good cause"; (3) the licensing requirements of both Ordinances; and (4) the do-not-solicit provision of the 2005 Ordinance.  OCA asked the district court to enjoin the City from enforcing all the challenged provisions and to issue a judgment declaring both ordinances unconstitutional.  Both sides moved for summary judgment.

In a ruling issued on February 16, 2010, the district court struck down the licencing requirements of the 2004 and 2005 Ordinances as unconstitutional. *See* R. 110 [hereinafter D. Ct. Op.]  The court also invalidated the do-not-solicit provision of the 2005 Ordinance, but upheld the requirement that would-be canvassers obtain a copy of the do-not-solicit list before going door to door.  The court further upheld the 6 P.M. curfew provisions contained in both ordinances.  Finally, the court ruled that OCA lacked standing to challenge the curfew-extension provision of the 2004 Ordinance.[4]

On March 3, 2010, after the district court released its opinion, but before it issued a final order terminating the case, Englewood filed notice that it had amended its solicitation ordinance by way of an emergency reading.  The City asked the court to take judicial notice that the new law ("the 2010 Ordinance") resolved all defects cited in the February 16, 2010, opinion and requested that any injunctive relief be denied as moot.  The notice included a copy of the newly passed amendments, but no affidavit or memorandum of support.  On March 5, 2010, the court declined the City's requests and, consistent with its prior opinion, enjoined enforcement of the 2005 Ordinance's do-not-

---

[4]In concluding its opinion, the court announced that it would hold a telephone conference on February 22, 2010, to discuss OCA's demands for damages and injunctive relief.  The court's docket reflects that a telephone conference occurred on February 22 and that a follow-up was scheduled, and took place, on March 4, 2010.  However, there is no indication of what transpired during these discussions.

solicit provision and the licensing requirement of the 2004 and 2005 Ordinances. The court acknowledged the passage of the 2010 Ordinance, but expressed no opinion as to its constitutionality or whether its enactment rendered the injunctions moot. Both sides timely appealed.[5]

## II. *DISCUSSION*

This Court reviews *de novo* a district court's decision to grant or deny summary judgment. *Dillon v. Cobra Power Corp.*, 560 F.3d 591, 595 (6th Cir. 2009). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Estate of Smithers v. City of Flint*, 602 F.3d 758, 761 (6th Cir. 2010); *see also* Fed. R. Civ. P. 56, Advisory Committee Notes ("The standard for granting summary judgment remains unchanged" despite 2010 amendments to Rule 56). A court reviewing a motion for summary judgment cannot weigh the evidence or make credibility determinations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010). Instead, the evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009).

### A.    OCA's Appeal

OCA argues that the district court erred in upholding the curfew and list-carrying provisions of the 2005 Ordinance, and in ruling that OCA lacked standing to challenge the curfew-extension provision of the 2004 Ordinance. We consider each claim in turn.

---

[5]The Ohio Municipal League, joined by several other entities, filed an amicus brief in support of Englewood. The American Civil Liberties Union of Ohio and the Watchtower Bible & Tract Society of New York filed separate amici briefs in support of OCA.

### 1.       Curfew Provision of 2004 and 2005 Ordinances

OCA asserts that the 6 P.M. curfew violates the First Amendment of the United States Constitution as a matter of law; alternatively, OCA claims that the district court should not have granted summary judgment to Englewood because questions of material fact remain regarding the curfew's constitutionality.

The First Amendment states in relevant part, "Congress shall make no law . . . abridging the freedom of speech." This prohibition applies to state and local governments through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); *Parks v. City of Columbus*, 395 F.3d 643, 647 (6th Cir. 2005). The protections afforded by the First Amendment are not absolute, however. In particular, governmental entities may "fix reasonable hours when canvassing may be done," within certain limits. *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 165 (1939).

OCA contends that the curfew violates the First Amendment on its face and as applied. A law that proscribes "a 'substantial' amount of constitutionally protected speech judged in relation to the statute's plainly legitimate sweep" is deemed overbroad and thus facially invalid. *Phelps-Roper v. Strickland*, 539 F.3d 356, 360 (6th Cir. 2008) (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)); *see also Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) ("[A]n overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable."). Facial invalidation "is strong medicine that is not to be casually employed." *Phelps-Roper*, 539 F.3d at 360 (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). While a facial challenge invokes the rights of others, an as-applied challenge is confined to the particular circumstance of the plaintiff. *See John Doe No. 1 v. Reed*, 130 S. Ct. 2811, 2817 (2010). "[A]lthough the occasional case requires us to entertain a facial challenge in order to vindicate a party's right not to be bound by an unconstitutional statute, we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." *United States v. Treasury Employees*, 513 U.S. 454, 477-78 (1994) (internal citations omitted).

Thus, "[t]he usual judicial practice is to address an as-applied challenge before a facial challenge . . . this sequencing decreases the odds that facial attacks will be addressed unnecessarily." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 327-28 (6th Cir. 2009) (en banc) (quoting *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484-85 (1989) (internal quotation marks omitted)). We do not address the facial validity of Englewood's curfew provision because we conclude that it cannot survive OCA's as-applied challenge.

The Supreme Court has yet to clarify what standard of review applies to ordinances regulating door-to-door canvassing. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 164 (2002) (expressly declining to resolve the issue). However, several circuits, including this one, have adopted the familiar time, place, and manner analysis when considering such ordinances. *See, e.g.*, *Ass'n of Cmty. Orgs. for Reform Now v. Town of E. Greenwich*, 239 F. App'x 612, 613 (1st Cir. 2007) (citing cases); *Parks v. Finan*, 385 F.3d 694, 695 (6th Cir. 2004); *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 240 F.3d 553, 560 (6th Cir. 2001), *overruled on other grounds*, 536 U.S. at 150. Under this framework, legislation regulating the content of speech is subject to the most exacting scrutiny, while a law that is content neutral receives intermediate (also referred to as "mid-level" or "heightened") scrutiny. *Turner Broad. Sys., Inc., v. FCC*, 512 U.S. 622, 642 (1994); *Connection Distrib. Co.*, 557 F.3d at 329. The parties agree that Englewood's solicitation ordinance, in all versions relevant to this lawsuit, is content neutral; therefore, we review it under intermediate scrutiny.

A governmental entity may impose reasonable, content-neutral restrictions on the time, place, or manner of protected speech, provided that such restrictions (1) prescribe adequate standards for administrating officials to apply; (2) are narrowly tailored to serve a significant governmental interest; and (3) leave open ample alternatives for communication. *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 & n.3 (2002) (citing *Forsyth*, 505 U.S. at 130); *H.D.V.–Greektown, LLC v. City of Detroit*, 568 F.3d 609, 623 (6th Cir. 2009). The governmental entity that enacts the regulation bears the burden of

establishing each element of the analysis, and "the Court ordinarily does not supply reasons the legislative body has not given." *Watchtower Bible & Tract Soc'y*, 536 U.S. at 170 (Breyer, J., concurring) (citing *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.")).

OCA does not dispute that Englewood's ordinance prescribes adequate standards for administrative officials to apply. OCA addresses the second and third requirements, arguing that the curfew is not narrowly tailored to a significant interest of the City and that it does not leave ample alternative channels for OCA to communicate its message.

A content-neutral regulation is deemed narrowly tailored to a significant governmental interest if "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner Broad. Sys.*, 512 U.S. at 662 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). To satisfy this standard,

> a regulation need not be the least speech-restrictive means of advancing the Government's interests. "Rather, the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Narrow tailoring in this context requires, in other words, that the means chosen do not "burden substantially more speech than is necessary to further the government's legitimate interests."

*Id.* (quoting *Ward v. Rock against Racism*, 491 U.S. 781, 799 (1989) (other quotation marks and citation omitted)).

Englewood contends that the curfew provision serves the City's significant interests in protecting the privacy rights of its citizens and preventing crime. We consider each argument in turn.

### a. Interest in Residential Privacy

Englewood argues that the curfew requirement serves to protect the privacy interests of its residents who do not want strangers knocking on their doors during dinner time. The district court held that restricting all canvassing activities after 6 P.M. was not a narrowly tailored means to achieve this objective. We agree.

There is no question that municipalities have a significant interest in protecting "the well-being, tranquility, and privacy of the home." *Ward*, 491 U.S. at 796. However, there are far less intrusive ways to preserve residential privacy than by restricting all manner of speech. In *Watchtower Bible and Tract Society*, a congregation of Jehovah's Witnesses challenged a town ordinance prohibiting canvassers from entering private residential property without first obtaining a permit. 536 U.S. at 154. The ordinance also forbade canvassers with valid permits from entering properties whose owners had filed a "no solicitation registration form" with the mayor and posted a "No Solicitation" sign on their property. *Id.* at 156. The village argued that the permitting requirement was necessary to protect residential privacy, but the Supreme Court disagreed, stating:

> [I]t seems clear that . . . the ordinance, which provides for the posting of "No Solicitation" signs . . . , coupled with the resident's unquestioned right to refuse to engage in conversation with unwelcome visitors, provides ample protection for the unwilling listener. The annoyance caused by an uninvited knock on the front door is the same whether or not the visitor is armed with a permit.

*Id.* at 168-69 (internal citation omitted).

In the instant case, Englewood's ordinance allows residents to avoid being inconvenienced by door-to-door canvassers at dinnertime by simply posting a "No Soliciting" sign on their property, *see* E.C.O. § 854.12. Moreover, the evidence does not support the City's claim that residents are particularly protective of their privacy after 6 P.M. To the contrary, as the district court observed, Englewood residents appear "generally averse to door-to-door advocacy, at any time of the day." D. Ct. Op. 45. The fact that 1777 of 5000 residences have signed the do-not-solicit list under the 2010

Ordinance does not rebut this finding. We therefore affirm the district court's ruling that Englewood's interest in protecting the privacy rights of its citizens supports neither the licensing requirement nor the curfew.

### b.        Interest in Crime Prevention

Englewood argues that, aside from protecting the privacy interests of its residents, the 6 P.M. curfew also serves to prevent and reduce crime within the City. There is no doubt that preventing crime is a significant governmental interest. *See, e.g.*, *Watchtower Bible & Tract Soc'y*, 536 U.S. at 163; *United States v. Salerno*, 481 U.S. 739, 755 (1987). Nevertheless, even when motivated by such a weighty concern, a municipality must strike a balance between its legitimate interests and the effect of legislation on First Amendment rights. *Watchtower Bible & Tract Soc'y*, 536 U.S. at 163. In this regard, the Supreme Court has made clear that, when scrutinizing legislation that restricts the dissemination of knowledge, courts "must be astute to examine the effect of the challenged legislation and must weigh the circumstances and . . . appraise the substantiality of the reasons advanced in support of the regulation." *Id.* (quoting *Martin v. City of Struthers*, 319 U.S. 141, 144 (1943)) (internal quotation marks omitted) (ellipsis in original).

Typically, when a municipality invokes its interest in crime prevention to defend the constitutionality of a solicitation ordinance, the argument focuses either on preventing crimes committed by persons who pose as canvassers, or ensuring the safety of the canvassers themselves.[6] Indeed, Englewood argues that criminals posing as

---

[6]*See, e.g.*, *Martin*, 319 U.S. at 144 ("[B]urglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later."); *SEIU, Local 3 v. Municipality of Mt. Lebanon*, 446 F.3d 419, 428 n.7 (3d Cir. 2006) ("The availability of direct punishment for crime has caused the Supreme Court to repeatedly reject government arguments that canvassing regulations are narrowly tailored to serve anti-crime interests." (citing cases)); *N.J. Citizen Action v. Edison Twp. (NJCA)*, 797 F.2d 1250, 1258 (3d Cir.), *cert. denied sub nom. Piscataway v. N.J. Citizen Action*, 479 U.S. 1103 (1987) ("[The ten municipal d]efendants produced no evidence to support a correlation between canvassing and crime, no evidence that a canvasser had ever committed any crime in these municipalities . . . , no evidence that the municipalities face a heightened crime rate, and no evidence of the experiences of or studies conducted by other towns."); *City of Watseka v. Ill. Pub. Action Council*, 796 F.2d 1547, 1556 (7th Cir. 1986), *aff'd*, 479 U.S. 1048, *reh'g denied*, 480 U.S. 926 (1987) ("Watseka failed to in any way link the evidence on nighttime crime to solicitation (*i.e.*, there is no evidence either of any crime being perpetrated by alleged solicitors or of differences in crime rates when no solicitation takes place)."); *Ass'n of Cmty. Orgs. for Reform Now v. City of Frontenac*, 714 F.2d 813, 818-19 (8th Cir. 1983) (defining crime

canvassers are a real threat, which alone justifies the curfew. However, with the exception of one, somewhat ambiguous incident,[7] the City offers no evidence of criminality by canvassers or solicitors in Englewood,[8] and relies entirely on reports from other jurisdictions.[9] Nor does the City present evidence of the preventive effect of curfews on crimes by door-to-door canvassers.

There is reason to doubt the effectiveness of a soliciting curfew in reducing crime. In *Watchtower Bible and Tract Society*, 536 U.S. at 169, in addressing a permitting requirement, the Supreme Court observed, "it seems unlikely that the absence of a permit would preclude criminals from knocking on doors and engaging in conversations not covered by the ordinance. They might, for example, ask for directions or permission to use the telephone, or pose as surveyors or census takers." *See also id.* at 170 (Breyer, J., concurring) ("It is also intuitively implausible to think that Stratton's ordinance serves any governmental interest in preventing [burglaries and violent] crimes."); *SEIU, Local 3*, 446 F.3d at 428 ("[A]s in *Watchtower*, we think it 'intuitively implausible to think' that those determined to commit such crimes will comply with the registration requirement.").

What seemed "unlikely" with regard to a permitting requirement is equally so in the case of a curfew. *See, e.g.*, *N.J. Citizen Action v. Edison Twp. (NJCA)*, 797 F.2d

---

prevention as reducing crime by individuals posing as solicitors).

[7] According to the City, a woman was once found going door to door and asking for donations for a nephew who needed surgery to remove a brain tumor, when in fact she was trying to support her drug habit. However, the record indicates that the woman was arrested based on outstanding bench warrants from nearby counties, not for committing fraud. Moreover, although the woman was a drug addict, she also apparently had a boyfriend whose nephew had brain cancer.

[8] An expert retained by Englewood testified that the police department received 389 calls regarding solicitors from January 2000 to December 2007. However, out of 9,463 cases analyzed, the expert did not identify a single offense or arrest that involved canvassing or solicitation activities.

[9] In particular, the City relies on Justice Rehnquist's dissent in *Watchtower Bible and Tract Society*, 536 U.S. at 172-73 (describing a gruesome double murder, perpetrated in New Hampshire by teenagers posing as canvassers, as an example of the "very grave risks associated with canvassing"), and cites to various cases from across the nation involving crimes committed by door-to-door salesmen, or predators posing as salesmen. *See, e.g.*, *Nautilus Ins. Co. v. Reuter*, 537 F.3d 733, 735-36 (7th Cir. 2008) (spate of violent crimes committed by door-to-door magazine salespersons in various states); *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 733 (Tex.1998) (woman raped at home by a door-to-door salesman); *McLean v. Kirby Co.*, 490 N.W.2d 229, 232 (N.D. 1992) (same); *State v. Steffen*, 31 Ohio St. 3d 111, 509 N.E.2d 383, 386-87 (1987) (same).

1250, 1258 (3d Cir.), *cert. denied sub nom. Piscataway v. N.J. Citizen Action*, 479 U.S. 1103 (1987) (finding that there was "no correlation between the ordinances and crime prevention and that the time restrictions on canvassing do not deter or prevent crime"); *City of Watseka v. Ill. Pub. Action Council*, 796 F.2d 1547, 1556 (7th Cir. 1986), *aff'd*, 479 U.S. 1048, *reh'g denied*, 480 U.S. 926 (1987) ("Watseka failed to offer any explanation why the people who came within the ordinance's definition of soliciting posed any greater burden on the police, or threat of crime, than the numerous other visiting strangers that the ordinance did not purport to cover."). There is no reason to believe (and Engelwood offers no evidence to support) that a curfew on soliciting activities deters criminals from posing as canvassers, or from approaching private residences under different pretenses altogether, such as to ask for directions, or by faking a medical emergency. *See Watseka*, 796 F.2d at 1556 ("Unfortunately, for the devious there is no shortage of opportunities."). Therefore, we hold that the City's 6 P.M. curfew is not narrowly tailored to its interest in preventing crime by door-to-door canvassers or by individuals posing as such.

### c.          Conservation of Public Resources

Although Engelwood does not concede the absence of a direct link between soliciting and crime, the principal thrust of its argument is that soliciting, although not criminal in itself, drains law-enforcement resources and interferes with law enforcement's ability to tackle other, more serious crimes. According to the City, canvassers and commercial solicitors alike generate an increasing number of complaints and calls to the police from citizens who object to being bothered at home. The City asserts that were it not for the curfew, the bulk of canvassing and soliciting – and, by extension, the majority of complaints – would occur in the evening,[10] when service calls for other crimes are at their peak. Englewood argues that "[e]nforcing the curfew all but eliminates residents calling the police with respect to solicitors, and this leaves police free to respond to other calls for service, as well as 'proactive police work,' which is

---

[10]There is no dispute that Englewood residents are most likely to be found at home in the late afternoon and evening, making these times the most desirable in which to canvas and solicit.

primarily in the form of traffic enforcement."  (City Br. 20; *see also* OML Br. 8-9.) Englewood credits this type of police work with reducing crime by 35% between 2000 and 2006, and argues that striking down the 6 P.M. curfew would divert resources from proactive law enforcement and defeat its crime-reduction strategy.

Englewood's argument hinges on a novel definition of the governmental interest in crime prevention.  The City proceeds on a theory that its municipal interest in preventing crime is not confined to preventing crimes directly related to door-to-door soliciting, but is overarching and includes ensuring that all resources devoted to crime fighting are deployed and utilized in the most efficient manner.  Thus, the central component of Englewood's interest-in-crime-prevention argument is the City's ability to allocate limited municipal resources as economically as possible.[11]

The Supreme Court has not specifically addressed whether the First Amendment yields to the governmental interest in allocating public funds in the manner deemed most effective to fight crime.  The Court has never held the efficient allocation of public resources to be an interest sufficient to survive heightened scrutiny,[12] but it has upheld

---

[11]Despite Englewood's argument to the contrary, this point was made explicit by several City officials and in the City's brief.  *See, e.g.*, R. 93, Dep. of Englewood City Manager, at 85 ("[W]e have an aggressive police force, and we . . . have, as all communities do, limited resources. . . .  So it's an allocation of resources issue."); City Br. 63 ("The harsh reality for municipalities, villages, and townships everywhere is that resources for their police forces will always be limited.  The heart of this case . . . is whether a city is able to utilize its police resources how it sees fit in order to effectively keep crime rates down.") (footnote and citation omitted).

[12]OCA argues that Supreme Court precedent rejects the notion of a significant governmental interest in conserving public resources, citing *Forsyth County v. Nationalist Movement*, 505 U.S. at 123, and *Schneider v. State*, 308 U.S. at 147.  In *Forsyth*, the Court held invalid an ordinance that authorized permit fees of up to $1,000 for marches, parades and other public assemblies, based in part on the anticipated expense of maintaining the public order at those events, stating: "Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." 505 U.S. at 134-35 (footnote and citations omitted).  In *Schneider*, the challenged ordinances prohibited distributing handbills and flyers on the public street or from house to house, in part on the theory that such activities encouraged or resulted in littering. 308 U.S. at 154-56.  The Supreme Court struck down these laws, stating: "Any burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution results from the constitutional protection of the freedom of speech and press." *Id.* at 162.  OCA reads *Forsyth* and *Schneider* for the principle that a municipality cannot conserve resources by making those who engage in constitutionally protected speech pay for the indirect consequences of their activities. However, since *Forsyth* and *Schneider* were strict-scrutiny cases, we cannot rule out that they could have been decided differently under a more lenient standard.

such an interest in certain rational-review cases.[13] We need not decide this issue here because even if such an interest were recognized it would be subject to the same intermediate scrutiny as traditional crime-prevention interests, and the City has failed to demonstrate that the curfew on door-to-door canvassing is narrowly tailored to its interest in preventing crime by economically allocating public resources.[14]

Englewood's raw statistical data cover the period from January 2000 to December 2007 and consists of police-department call logs, which track all calls for service by date, time, and subject matter, and a list of all criminal offenses committed in Englewood, also sorted by date and time. The data are compiled into eight graphs, one for each year from 2000 to 2007, and one summary graph titled "2000-2007 Averages by Time of Day." Each graph compares the number of offenses committed, arrests effectuated, total service calls received, and solicitation-related service calls received. (R. 78-7, at 3; Appendix of Colored Exhibit Filed in Trial Court (filed Aug. 9, 2010).) The summary graph is reproduced in the Appendix to this opinion, together

---

[13] *See, e.g.*, *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (holding that, under rational review, courts may consider the effect that recognizing a prisoner's right in the prison context would have on the prison system's financial resources); *Lyng v. Int'l Union*, 485 U.S. 360, 365 (1988) (upholding federal law denying food stamps to striking workers and their families and stating that, under rational review, courts' "review of distinctions that Congress draws in order to make allocations from a finite pool of resources must be deferential, for the discretion about how best to spend money to improve the general welfare is lodged in Congress rather than the courts."); *Martinez v. Bynum*, 461 U.S. 321, 329 (1983) (holding that a constitutional requirement that parents of students attending public schools reside in the same district as their children was rationally related to the state's "interest in assuring that services provided for its residents are enjoyed only by residents."); *Dandridge v. Williams*, 397 U.S. 471, 479-80 (1970) (holding, in an equal-protection case, that a law capping aid grants to families with dependent children (thereby discriminating against larger families) was rationally related to the state's interest in preserving and allocating limited resources among multiple recipients). *But see Romer v. Evans*, 517 U.S. 620, 635 (1996) (rejecting, under the rational-basis standard, the state's argument that conserving resources to fight discrimination against other minority groups justified a constitutional amendment that prohibited making homosexuality a protected class); *Plyler v. Doe*, 457 U.S. 202, 224-26 (1982) (holding under rationality review that preservation of state resources was not a legitimate interest to deny free public education to undocumented children).

[14] We do note, however, the difficulties inherent in recognizing such an interest in fundamental-rights cases. First, once such an interest exists, it is extremely difficult to circumscribe. Second, unless courts are to review governmental budgetary decisions, which would set a disturbing precedent, they must take the government's word that it cannot afford to guarantee fundamental rights. Third, if fundamental rights were protected only to the extent that the government can afford to do so, the scope of such protection would differ from one community to the next, and presumably also vary over time. Inevitably, the task of deciding the extent to which each community can restrict expressive activities would fall upon the courts, whose rulings could be challenged with each fluctuation in economic conditions, or with adoption of every new budget.

with the numerical data on which it is based. (See City Reply Br. 5-6; R. 78-7, Lang Aff., at 3, 19.)

At the outset, we observe that Englewood's data lack clarity in several respects. Notably, service calls are not distinguished according to whether they concern solicitations of a commercial or charitable nature; this is significant because our inquiry is different depending on the type of solicitation at issue. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 562-63 (1980) ("The Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."); *NLRB v. Midland Daily News*, 151 F.3d 472, 474-75 (6th Cir. 1998) (explaining the test for solicitations of a commercial nature).[15] It is also important to note that the City's summary graph does not represent the average number of calls to the police department during any given hour of any given day, or even any given day of the week. Rather, it shows the average number of calls received during a given hour – from 4 to 5 P.M., for example – over a seven-year period.[16] Therefore, while the graph is helpful to track overall fluctuations in hourly call rates, it does not tell us whether calls are distributed evenly across the days of the week or seasons of the year. The City also fails to define what qualifies as a "solicitation call." For instance, Englewood's data show several solicitation calls between 11 P.M. and 2 A.M.; it is doubtful that these calls were due to a bona fide solicitor knocking on someone's door. Finally, the City provides no indication of how much police time is consumed by solicitation-related calls, compared to the time expended in responding to service calls concerning other crimes.

---

[15]The City also distinguishes between *service calls* and *citizen complaints*, without explaining the difference between the two, or describing how the police department responds to each.

[16]For example, the graph indicates that the police department received 914 calls for service between midnight and 1 A.M. This does not mean that there were 914 calls, on average, every night of the year between midnight and 1 A.M.; rather, it means that, from 2000 to 2007, the police received an annual average of 914 calls between the hours of midnight and 1 A.M., including weekends and holidays. The eight individual graphs show the total number of calls received during a given hour over the entire year. For instance, in 2007, the police department received a total of 943 calls between midnight and 1 A.M. (*See* R. 78-7, at 18.)

Englewood makes a number of claims based on its statistical data. These assertions are discussed individually below.[17]

- Englewood contends that the number of service calls complaining about soliciting has dramatically increased from 2000 to 2007. Indeed, the number of calls regarding all types of soliciting has risen during the relevant period. (*See* R. 78-7, at 11-18.) However, the data do not reveal how much of this increase is attributable to commercial solicitations, as opposed to charitable and political ones; in fact, we know that Englewood's figures include a significant number of service calls regarding commercial solicitors.[18] Further, soliciting-related calls represent only a fraction of all calls to the police, even in most recent years. (*See id.*) In 2007, the year with the greatest number of solicitation-related calls (69 for the year), those calls for service represented only a little over three tenths of one percent of the 21,878 service calls received during the year.

- Englewood claims that, thanks to its curfew, service calls relating to solicitors are "almost non-existent" after 6 P.M. (City Br. 10; *see also id.* at 20 ("Enforcing the curfew all but eliminates residents calling the police with respect to solicitors, and this leaves police free to respond to other calls for service").) This is flatly contradicted by the record. Soliciting-related calls tend to increase in the early afternoon and peak between 1 and 6 P.M.; however, the police continue to receive calls regarding solicitors after 6 P.M., at rates comparable to the morning and parts of the afternoon.

- Englewood represents that "[t]he number of calls for service for criminal activity sharply increases from 4:00 PM through midnight in Englewood." (City Br. 10.) However, the City's graph shows that service calls peak from 3 P.M. to 6 P.M. and then decrease. There are fewer calls between 6 and 9 P.M. than between 3 and 6 P.M.

---

[17]Unless otherwise indicated, this discussion refers to the graph and table in Appendices 1 and 2.

[18]For example, in January 2007 alone, there were six calls complaining about solicitors for "Kirby Vacuum Cleaners." (*See* R. 78-3, at 21.) Police records also document calls regarding persons selling magazines and newspaper subscriptions (*id.* at 5-9, 11-15, 17-19, 27), cleaning products (*id.* at 3-4, 11-17), stereo equipment (*id.* at 4, 13, 18, 23), meat (*id.* at 5, 13-14, 16, 27), and sex (*id.* at 6, 21). There are also complaints about unwanted solicitations from panhandlers (*id.* at 4-6, 8-11, 17-19, 23, 25, 27), hitchhikers (*id.* at 17, 19, 21, 23, 25), satellite-television vendors (*id.* at 14, 19, 27), tree trimmers and stump removers (*id.* at 18, 19, 21, 26-27), and representatives for "the Gutter Genie" and "Xtreme Chemical," (*id.* at 7, 9, 23). Moreover, a number of service calls appear related to solicitations in public places or in stores, not door to door. (*See, e.g.*, *id.* at 7-10, 17, 19, 21, 23 (hitchhiking at gas stations or near highway on/off ramps, soliciting near large supermarkets and department stores, or in public parks)). Finally, the data also contain service calls complaining about salespersons who actually have a permit, but are rude to residents. (*Id.* at 27.)

●     Englewood asserts that there is a much larger volume of service calls between 4 P.M. and midnight and that the peak time for service calls is from 4 to 9 P.M. However, the City does not claim that it cannot maintain order between 4 and 6 P.M., despite the fact that most calls occur during those hours, when soliciting is permitted. Further, because service calls relating to soliciting are so few in comparison to all other calls, nothing suggests that the police would be overwhelmed with additional calls if the curfew were lifted.

In summary, although there has been an increase in the volume of calls from Englewood residents complaining about solicitors from 2000 to 2007, in all other respects, the City's data do not bear out its claims. Englewood's main argument is that the 6. P.M. curfew on soliciting is a key component of its overall strategy to reduce crime. However, the record contains no evidence of the correlation between the number of calls to law enforcement regarding solicitors and law enforcement's ability to reduce crime. The City emphasizes that between January 2000, when the police initiated its strategy of proactive law enforcement, and December 2007, the overall crime rate in Englewood dropped by 35%. However, Englewood's 6 P.M. curfew was in effect long before 2000; therefore, while the drop in criminality since 2000 may reflect the effectiveness of proactive policing, it is not evidence of the curfew's contribution to the City's crime-fighting strategy.[19]

Englewood defends the sufficiency of its evidence and submits that its successful approach to fighting crime will be "in jeopardy" if the 6 P.M. curfew is struck down.

---

[19]In support of its ordinance, Englewood cites several cases that upheld curfews on soliciting; we find none of these cases persuasive. In *Pennsylvania Alliance for Jobs and Energy v. Council of Munhall (PAJE)*, 743 F.2d 182 (3d Cir. 1984), the Third Circuit upheld a curfew similar to, and perhaps more restrictive than, Englewood's. The ordinances in *PAJE* prohibited noncommercial door-to-door canvassing after dusk on week days, after noon on Saturdays and all day on Sundays. *Id.* at 184. However, three years later, another panel of the same court struck down several virtually identical ordinances in *New Jersey Citizen Action v. Edison Township (NJCA)*, 797 F.2d at 1266, *reh'g & reh'g en banc denied* (1986). The *NJCA* court distinguished its precedent by explaining that "[t]he *PAJE* district court had found, presumably on the basis of unrebutted affidavits, . . . a significant incidence of burglary and home invasion," whereas the plaintiff in *NJCA* presented "ample rebutting evidence and its own factual findings." *Id.* at 1257. Englewood argues that its evidence in the instant case is similarly unrebutted and that the district court's findings should therefore stand. However, contrary to the *NJCA* court, we are not bound by circuit precedent upholding a canvassing curfew. Further, the continuing validity of *PAJE* is questionable. Indeed, despite a vigorous dissent, which convincingly argued that *NJCA* overruled *PAJE* in violation of circuit rules, the *en banc* Third Circuit denied rehearing. Englewood also cites *McMurdie v. Doutt*, 468 F. Supp. 766, 776-77 (N.D. Ohio 1979), which upheld a solicitation ordinance containing a 6 P.M. curfew, but ruled that the town had unconstitutionally applied the law by denying all permit requests by the Unification Church of Reverend Sun Myung Moon. However, the court's opinion does not state whether the Unification Church challenged the ordinance's curfew.

We cannot agree. Englewood's argument rests entirely on the premise that, some day, service calls related to soliciting will make it impossible for the police to handle other, more urgent tasks. Of course, if the number of solicitation-related calls continues to increase *ad infinitum*, they could conceivably, one day, overwhelm the system. However, nothing suggests that this is at all imminent, or that the 6 P.M. curfew is preserving Englewood from such a crisis.

Finally, Englewood argues that the 6 P.M. curfew simply reflects both the "harsh realities" of modern existence and how different America is today compared to 1943, when the Supreme Court observed that "[f]or centuries it has been a common practice in this and other countries for persons not specifically invited to go from home to home and knock on doors or ring doorbells to communicate ideas to the occupants or to invite them to political, religious, or other kinds of public meetings." *Martin*, 319 U.S. at 141. Englewood notes that the population of the United States has more than doubled since these words were written, and that crime rates have risen at an even greater pace. The period since 1943 has also seen the advent of computers, satellite television, cell phones, and other technologies that have revolutionized human interactions; indeed, Englewood points out, OCA itself uses the internet and email to communicate with its members. In requesting that we uphold the 6 P.M. curfew, the City asks us to take judicial notice of "the fearful times we live in . . . , the unprecedented and difficult economic times facing the geographic region where Englewood is located," and of the fact that "door-to-door communications are no longer a centerpiece of communications in this country." (City Br. 33, 32 (footnote omitted).) To hold otherwise, Englewood argues, is "to ignore the safety of Englewood residents." (City Reply Br. 9.)

As an initial matter, we note that Englewood residents concerned about criminals who pose as canvassers or solicitors can take the simple affirmative step of placing their names on Englewood's do-not-solicit list, the validity of which is unaffected by this ruling, or posting do not solicit signs on their doors. More to the point, we may certainly take judicial notice that like many metropolitan areas in the United States, Dayton and its surroundings face difficult, if not severe, economic times. *See Ohio Bell Tel. Co. v.*

*Pub. Util. Comm'n of Ohio*, 301 U.S. 292, 301 (1937) ("Courts take judicial notice of matters of common knowledge. They take judicial notice that there has been a depression, and that a decline of market values is one of its concomitants.") (citations omitted). However, only facts that are "not subject to reasonable dispute" may be judicially noticed. Fed. R. Evid. 201(b). Thus, we cannot simply take judicial notice of the transformation of American society since 1943 to conclude, as the City urges, that the safety of Englewood's residents depends upon prohibiting door-to-door canvassing after 6 P.M. To do so would "turn [judicial notice] into a pretext for dispensing with a trial." *Garner v. Louisiana*, 368 U.S. 157, 173 (1961) (quoting *Ohio Bell Tel. Co.*, 301 U.S. at 302).

Thus, regardless of whether allocating public resources in the manner best suited to fight crime constitutes a significant governmental interest withstanding heightened scrutiny, the evidence Englewood put forth fails to demonstrate that the 6 P.M. curfew is narrowly tailored to serve that interest. Since the City cannot satisfy this prong of the analysis, we need not consider whether the ordinance leaves open ample alternative channels for OCA to communicate its message.

**2.     OCA's Standing to Challenge the Curfew-Extension Clause of the 2004 Ordinance**

The 2004 Ordinance contained a curfew-extension clause, which gave the City Manager discretion to waive the 6 P.M. curfew "for a good cause." The district court held that OCA lacked standing to challenge this clause because OCA did not suffer an injury in fact traceable to the City Manager's discretion to extend the curfew. OCA challenges this ruling.

Standing is determined at the time the complaint is filed. *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004), *cert. denied*, 544 U.S. 949 (2005). The minimal standing requirements of Article III of the United States Constitution require showing the following:

> (1) [the plaintiff] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

(2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).[20]

Ordinarily, "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755-56 (1988); *Miller v. City of Cincinnati*, 622 F.3d 524, 532 (6th Cir. 2010). Moreover, "because unfettered governmental discretion over the licensing of free expression 'constitutes a prior restraint and may result in censorship,' a plaintiff may bring facial challenges to statutes granting such discretion 'even if the discretion and power are never actually abused.'" *Miller*, 622 F.3d at 532 (quoting *Lakewood*, 486 U.S. at 757); *see also Freedman v. Maryland*, 380 U.S. 51, 56 (1965) ("[O]ne has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license."). The curfew-waiver clause of the 2004 Ordinance gave the City Manager unfettered discretion to waive the 6 P.M. curfew for certain organizations or activities and enforce it with regard to others. Therefore, barring other standing-related concerns, OCA would have standing to mount a facial First Amendment challenge against this portion of the statute regardless whether OCA or its members suffered any injury linked to its use.

But there is another standing-related concern here – mootness. Englewood argues that OCA's challenge is moot because the 2004 Ordinance was repealed before OCA initiated this lawsuit and because the discretionary-waiver clause was dropped

---

[20]Several other requirements must also be satisfied to establish standing. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (discussing the "prudential dimensions" of standing); *Friends of the Earth*, 528 U.S. at 181 (explaining the requirements of associational standing). The City does not dispute that OCA meets these requirements.

from the 2005 Ordinance. The jurisdiction of federal courts extends only to actual, ongoing cases or controversies. *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). A case may become moot if, as a result of events that occur during pendency of the litigation, "the issues presented are no longer 'live' or parties lack a legally cognizable interest in the outcome." *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 781 (6th Cir. 2007) (internal quotation marks and citation omitted); *Berger v. Cuyahoga Cnty. Bar Ass'n*, 983 F.2d 718, 724 (6th Cir. 1993). However, if the plaintiff's complaint includes a claim for damages, that claim "preserves the plaintiff['s] backward-looking right to challenge the original law and to preserve a live case or controversy over that dispute." *Midwest Media Prop., LLC v. Symmes Twp.*, 503 F.3d 456, 461 (6th Cir. 2007) (citing *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 387 (6th Cir. 2005)); *see generally* 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3533.3 (3d ed. 2008). In this case, OCA also sought money damages for injuries allegedly suffered as a result of the curfew-waiver clause. However, even if OCA were to succeed in establishing that the waiver clause was unconstitutional, it cannot state a valid claim for damages. OCA received a curfew waiver on April 12, 2005. OCA is the only entity known to have requested and benefitted from such a waiver, and it never asked for another extension thereafter. On these facts, OCA cannot show any injury deserving of compensation. Thus, we find no reversible error in the district court's dismissal of OCA's challenge to the 2004 Ordinance's curfew-waiver clause.

### 3.        Do-Not-Solicit-List Provision of the 2005 Ordinance

OCA challenged the do-not-solicit-list provision of the 2005 Ordinance, which prohibited entry onto any property listed on the City's do-not-solicit list. E.C.O. § 854.12(b). The district court held this provision unconstitutional because there was no obligation for the City to regularly update the list and because juveniles under the age of 17 were exempted from its requirement. The district court permanently enjoined enforcement of this provision. However, the court did not invalidate the requirement that solicitors carry the list when soliciting in Englewood.

OCA argues that there is no sense in requiring solicitors to carry the do-not-solicit list after the court's decision effectively rendered the list meaningless. However, this does not present a legal challenge to the district court's decision.[21]

Alternatively, OCA asserts that the list-carrying provision unconstitutionally requires an affirmative act in order to engage in protected speech, and that this requirement burdens the right to engage in anonymous and spontaneous speech. In support, OCA cites *Watchtower Bible and Tract Society*, which struck down a no-solicitation ordinance in part because it imposed a prior condition on the right to engage in public speech and because it had the effect of banning "a significant amount of spontaneous speech." 536 U.S. at 167. The district court rejected both arguments.

The ordinance in *Watchtower Bible and Tract Society* required anyone seeking to engage in door-to-door advocacy to identify themselves to local authorities, apply for a permit, and wait for its issuance before canvassing. *Id.* at 154-56. By contrast, Englewood does not require canvassers to divulge their identity to receive a copy of the do-not-solicit list, and OCA cites nothing in this record suggesting that obtaining the list is difficult or burdensome, or takes an undue amount of time. Thus, on this record, we will not reverse the district court's rejection of OCA's challenge to this provision of the 2005 ordinance. The constitutionality of the 2010 Ordinance and the do-not-solicit-list provision contained therein are not before us in this appeal.

## B.     ENGLEWOOD'S CROSS-APPEAL

Englewood argues that OCA lacks standing to challenge the curfew provision of the 2004 Ordinance. In addition, the City appeals the district court's order permanently enjoining portions of the 2004 and 2005 Ordinances. We consider each claim in turn.

---

[21]OCA also argues that the list-carrying provision of the 2005 Ordinance was not severable from the rest of the statute, and therefore the injunction banning enforcement of the do-not-solicit provision necessarily invalidated the list-carrying requirement as well. Neither party raised this issue below, however, *see* D. Ct. Op. 76 n.33, and therefore the argument is waived on appeal.

**1.     OCA's Standing to Challenge the Curfew Provision of the 2004 Ordinance**

In its response brief in OCA's appeal, Englewood argues that OCA lacked standing to challenge the curfew provision of the 2004 Ordinance, not just the curfew-extension clause.  The City claims that because OCA obtained a curfew extension on April 12, 2005, and because it did not attempt to canvass in Englewood after this incident, OCA was not injured by the 2004 Ordinance.

As discussed in Part II.A.2., *supra*, OCA is unable to demonstrate that it was injured as a result of the curfew-waiver clause.  However, the analysis concerning the curfew itself is different.  To establish injury in fact, OCA must simply show that its expressive rights under the First Amendment were impinged upon by the City's application of the curfew.  It is undisputed that, following the events of April 12, 2005, the City warned OCA that it would henceforth strictly enforce the 6 P.M. curfew.  Given this credible threat of injury, OCA was not required to undergo prosecution in order to obtain relief.  *See Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998) ("[I]t is clear that an individual does not have to await the consummation of threatened injury to obtain preventive relief.  Rather, if the injury is certainly impending, that is sufficient.") (citing *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979)).

Englewood also argues that OCA's claims regarding the 2004 Ordinance were rendered moot by the passage of the 2005 Ordinance.  However, OCA's damages claim relating to the enforcement of the curfew provision preserved its "backward-looking right to challenge" the 2004 Ordinance.  *See supra* Part II.A.2.; *Midwest Media Prop.*, 503 F.3d at 461.  Contrary to the curfew-waiver clause discussed *supra*, OCA's allegation that it refrained from canvassing door to door in Englewood because of the City's threat to strictly enforce the 6 P.M. curfew could form the basis of a valid claim for damages.  Therefore, OCA's challenge to the City's enforcement of the curfew provision of the 2004 Ordinance remains active and, in light of our ruling in Part II.A.1, *supra*, viable.

**2.       Injunctions Concerning Portions of the 2004 and 2005 Ordinances**

Englewood appeals the district court's order permanently enjoining enforcement of the 2005 Ordinance's do-not-solicit provision and the licensing requirement of the 2004 and 2005 Ordinances.**22**  The City does not challenge the court's ruling on the merits, but challenges the court's decision to grant injunctive relief without considering the 2010 amendments to the ordinance.  Englewood argues that because adoption of the 2010 Ordinance extinguished its defective predecessors, there was no continuing irreparable injury to OCA after March 2, and thus no basis for the permanent injunctions issued three days later.  *See Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006) ("A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law.") (internal quotation marks and citation omitted).

In essence, Englewood claims that the district court erred in failing to take judicial notice that, by passing the 2010 Ordinance, the City fully complied with the February 16 opinion.  We disagree.  "A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Friends of the Earth*, 528 U.S. at 174; *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003).  Instead, the defendant bears "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190 (citation omitted).  Moreover, beyond giving the district court notice of its newly enacted ordinance, the City did not present any argument explaining how it had remedied the deficiencies of the prior ordinances and why the injunctions should be lifted.  The legal and factual questions raised by City's challenge to the injunction are best addressed to the district court by way of a motion to dissolve, amend or otherwise modify the March 5 order pursuant to Federal Rule of Civil Procedure 60(b), and therefore we decline to consider them here.  *See Deja Vu of Nashville, Inc.*

---

**22**The district court issued its opinion declaring the 2004 and 2005 Ordinances unconstitutional on February 16, 2010, and its order enjoining enforcement of certain parts of these ordinances on March 5, 2010.  In the interim, on March 3, the City filed notice that it had passed the 2010 Ordinance.  The court's March 5 order acknowledged the new ordinance, but refused to comment about its constitutionality or whether it complied with the court's February 16 opinion.

*v. Metro. Gov't of Nashville & Davidson Cnty.*, 466 F.3d 391, 395 (6th Cir. 2006) ("[M]odifications or dissolution of injunctions must take place under Rule 60(b).") (citing *Rufo v. Inmates of the Suffolk Cnty. Jail*, 502 U.S. 367, 380 (1992)).

### III.  *CONCLUSION*

For the reasons set forth above, we

1.  **AFFIRM** the district court's ruling that the 6 P.M. curfew is not related to Englewood's interest in protecting residential privacy;

2.  **REVERSE** the district court's ruling that the 6 P.M. curfew is narrowly related to Englewood's interest in preventing crime;

3.  **AFFIRM** the district court's rejection of OCA's challenge to the curfew-extension provision of the 2004 Ordinance;

4.  **AFFIRM** the district court's rejection of OCA's challenge to the list-carrying provision of the 2005 Ordinance;

5.  **AFFIRM** the district court's ruling that OCA has standing to challenge the curfew provision of the 2004 Ordinance; and

6.  **DENY** Englewood's cross-appeal of the district court's order enjoining enforcement of certain provisions of the 2004 and 2005 Ordinances.

The case is remanded to the district court for proceedings consistent with this opinion.

*APPENDIX 1*:  "2000-2007 Averages by Time of Day" Chart



PLAINTIFF'S
EXHIBIT
6
2-29-08  Smm

*APPENDIX 2*:  Numerical Data for "2000-2007 Averages by Time of Day" Chart

| Time of Day | Offenses | Calls for Service | Arrests | Solicit. Calls |
|---|---|---|---|---|
| 12-1 A.M. | ●67 | ●914 | ●31 | ●1 |
| 1-2 A.M. | ●53 | ●755 | ●29 | ●1 |
| 2-3 A.M. | ●41 | ●575 | ●25 | ●0 |
| 3-4 A.M. | ●29 | ●362 | ●19 | ●0 |
| 4-5 A.M. | ●16 | ●302 | ●10 | ●1 |
| 5-6 A.M. | ●9 | ●295 | ●4 | ●1 |
| 6-7 A.M. | ●15 | ●273 | ●4 | ●1 |
| 7-8 A.M. | ●18 | ●548 | ●6 | ●1 |
| 8-9 A.M. | ●35 | ●892 | ●13 | ●1 |
| 9-10 A.M. | ●31 | ●907 | ●22 | ●2 |

| Time of Day | Offenses | Calls for Service | Arrests | Solicit. Calls |
|---|---|---|---|---|
| 10-11 A.M. | ●33 | ●941 | ●24 | ●3 |
| 11 A.M. - 12 P.M. | ●36 | ●956 | ●30 | ●3 |
| 12-1 P.M. | ●44 | ●935 | ●31 | ●3 |
| 1-2 P.M. | ●41 | ●1032 | ●27 | ●5 |
| 2-3 P.M. | ●47 | ●853 | ●30 | ●5 |
| 3-4 P.M. | ●59 | ●1274 | ●34 | ●4 |
| 4-5 P.M. | ●66 | ●1570 | ●37 | ●4 |
| 5-6 P.M. | ●70 | ●1316 | ●35 | ●5 |
| 6-7 P.M. | ●69 | ●1137 | ●27 | ●3 |
| 7-8 P.M. | ●62 | ●946 | ●31 | ●4 |
| 8-9 P.M. | ●77 | ●1010 | ●34 | ●3 |
| 9-10 P.M. | ●73 | ●1041 | ●33 | ●3 |
| 10-11 P.M. | ●75 | ●870 | ●26 | ●1 |
| 11 P.M. - 12 A.M. | ●68 | ●817 | ●24 | ●1 |

Figures are rounded up and down accordingly.