RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0122p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

TREE OF LIFE CHRISTIAN SCHOOLS,

*Plaintiff-Appellant,*

*v.*

CITY OF UPPER ARLINGTON,

*Defendant-Appellee.*

No. 14-3469

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:11-cv-00009—George C. Smith, District Judge.

Argued: April 29, 2015

Decided and Filed: May 18, 2016

Before: BOGGS, SUHRHEINRICH, and WHITE, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Erik W. Stanley, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, for Appellant. Mark D. Landes, ISAAC, WILES, BURKHOLDER & TEETOR, Columbus, Ohio, for Appellee. **ON BRIEF:** Erik W. Stanley, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, Philip Gerth, Daniel J. Skinner, Todd A. Fichtenberg, GERTH & SKINNER, LLC, Columbus, Ohio, for Appellant. Mark D. Landes, Craig R. Mayton, Scyld D. Anderson, ISAAC, WILES, BURKHOLDER & TEETOR, Columbus, Ohio, for Appellee. Philip K. Hartman, Yazan S. Ashrawi, FROST BROWN TODD, LLC, Columbus, Ohio, James C. Becker, Columbus, Ohio, for Amici Curiae.

BOGGS, J., delivered the opinion of the court in which SUHRHEINRICH, J., joined, and WHITE, J., joined in part. WHITE, J. (pp. 13–25), delivered a separate opinion concurring in part and dissenting in part.

1

---

**OPINION**

---

BOGGS, Circuit Judge.   Defendant-Appellee Upper Arlington (the government), a suburb of Columbus, Ohio, regulated the use of land owned by Plaintiff-Appellant Tree of Life Christian Schools (TOL Christian Schools).   As a result of this regulation, TOL Christian Schools could not use its land to operate a religious school.   TOL Christian Schools, after corresponding with and applying to the government on related proposals, applied to rezone the property to allow use as a religious school.   The government denied the application because such a use would not accord with certain aspects of the government's Master Plan.   In its denial, the government focused on the Master Plan's provision that the government maintain zoning for commercial uses in order to maximize its income-tax revenue.

After the denial, TOL Christian Schools filed this suit.   The suit primarily claims, under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc–2000cc-5, that the government illegally failed to treat TOL Christian Schools on equal terms with nonreligious assemblies or institutions.   After both parties moved for summary judgment, the district court granted summary judgment to the government.   This was error.

Although the record in this case is complex, we can summarize our view briefly.   TOL Christian Schools purchased the largest office building in Upper Arlington, unused at the time of the purchase, and attempted to negotiate with the government to open a religious school.   The government refused to strike a deal with TOL Christian Schools in hopes, apparently unfounded, that the property's former occupant, AOL/Time Warner (or its equivalent), would return.   Such a result, the government officials further hoped, would mark the first step in a plan to increase services by increasing personal-income-tax revenues without allowing multifamily, retail, or commercial use of land currently zoned for only single-family residential use.

Anticipating controversies similar to this one, and affirming its commitment to protecting religious freedom, Congress enacted RLUIPA, which provides, among other things, that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious

assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). Different circuits interpret this provision differently. Some circuits have held that a land-use regulation must treat "similarly situated" religious and nonreligious assemblies and institutions equally. The Eleventh Circuit has held that a government land-use regulation that discriminates against a religious assembly or institution in comparison to *any* nonreligious assembly or institution is invalid unless it is narrowly tailored to achieve a compelling government interest.

Under any approach, the issue in this case is whether the government treats nonreligious assemblies or institutions that would fail to maximize income-tax revenue in the same way it has treated the proposed religious school. That is a factual, not a legal, question. Federal courts may not resolve genuine issues of material fact on motions for summary judgment, even in proceedings for equitable relief. So, the district court's grant of summary judgment to the government was error. We reverse the judgment of the district court and remand. We explain more fully our reasoning below.

I

In 2009, AOL/Time Warner, a media company not party to this litigation, vacated an office building located at 5000 Arlington Centre Boulevard in Upper Arlington. The same year, TOL Christian Schools, a school with several campuses across the Columbus area supported by local churches, began negotiations that would conclude in August 2010 with its purchase of the property at 5000 Arlington Centre Boulevard.

Upper Arlington is a primarily residential suburb. It has assembled various land-use and economic regulations in the Unified Development Ordinance (UDO). The UDO zones Upper Arlington. The UDO provides for seven criteria to "be followed in approving zoning map amendments to the UDO." UDO § 4.04(C). One of those criteria provides "[t]hat the proposed zoning district classification and use of the land will generally conform with the master plan." *Id.* § 4.04(C)(5).

The Master Plan focuses on regulating uses of land in order to increase the government's income-tax revenues. For this reason, it emphasizes the importance of using certain non-

residential land as office space.[1]  The government theorized that such land use will attract high-income professionals, whose income the government can tax.  The zone for office use, under the UDO, is the "ORC Office and Research District" (ORC District).  According to the UDO, the purpose of the ORC District is

> to allow offices and research facilities that will contribute to the City's physical pattern of planned, healthy, safe, and attractive neighborhoods. The ORC district should also provide job opportunities and services to residents and contribute to the City's economic stability. Permitted uses in the ORC district are: business and professional offices, research and development, book and periodical publishing, insurance carriers, corporate data centers, survey research firms, outpatient surgery centers, [and] hospitals . . . .

UDO § 5.03(A)(6).  The ORC District includes 5000 Arlington Centre Boulevard.

Extended negotiation between TOL Christian Schools and the government preceded this case.  On January 5, 2011, after negotiations had failed, TOL Christian Schools filed this federal case, alleging that Upper Arlington had violated RLUIPA's Equal Terms Provision, and seeking injunctive relief.  After procedural developments in this case, including a previous appeal to this court, not now relevant, TOL Christian Schools "submitted a[n] . . . application to the [Government] to *rezone* its property. . . . from ORC Office and Research District to residential," in which zone the government allows land to be used for schools, religious or otherwise. *Tree of Life Christian Schs. v. City of Upper Arlington*, 16 F. Supp. 3d 883, 892 (S.D. Ohio 2014) (emphasis added).  In response to this zoning amendment that TOL Christian Schools proposed, the government's senior planning officer, Chad Gibson, reported to the City Council that he

> believe[d] that the proposed rezoning is in direct opposition to numerous core master plan goals and objectives. The proposed zoning change would eliminate nearly 16 acres of extremely limited ORC-zoned ground, which will reduce the amount of office and research space within the City. . . . [A]*pproving such a rezoning would be contrary to the City's long-term financial interests.*

Chad Gibson, Staff Report to Upper Arlington City Council (Nov. 25, 2013) (emphasis added).  In addition, the City Attorney spoke to the City Council, focusing on the fact "that rezoning to

---

[1]The government implies that the Master Plan's purpose is straightforward and unitary.  We assume as much without deciding.  But we note that, even on the few pages of the Master Plan submitted in the record, it might be possible for reasonable minds to derive from the Master Plan's language different understandings of what uses conform.  Such difference would make consistent compliance with the relevant UDO provisions difficult indeed.

eliminate commercially zoned property would be contrary to the master plan." *Tree of Life Christian Schs.*, 16 F. Supp. 3d at 892. Based on Gibson's report and the City Attorney's comments, "the Council denied [TOL Christian Schools]'s rezoning request" on December 9, 2013. *Ibid.*

On February 11, 2014, TOL Christian Schools moved for summary judgment on its claims in the district court. On March 6, 2014, Upper Arlington submitted both a memorandum opposing the motion of TOL Christian Schools and a cross-motion for summary judgment. On April 18, 2014, the district court granted summary judgment to the government, reasoning along the lines of Gibson's report. TOL Christian Schools timely appealed.

II

A

As a general matter, *municipalities* regulate land use. The *federal government*, by contrast, generally does not regulate local land use. But Congress has long concerned itself with the protection of religious freedom. As the Department of Justice has observed,

> despite the guarantee of religious freedom in our founding documents, individuals and groups have faced discrimination based on religion throughout our history. And throughout our history, Congress and the federal government have repeatedly acted to protect Americans from such discrimination. . . .
>
> For example, while it was passed largely in response to ongoing racial tensions, the landmark Civil Rights Act of 1964 included religion along with race . . . as categories in which persons are protected against discrimination in a host of areas . . . .

U.S. Dep't of Justice, *Report on the Tenth Anniversary of the Religious Land Use and Institutionalized Persons Act* 1 (Sept. 22, 2010).

"RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens . . . ." *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005). In 1993, Congress enacted the Religious Freedom Restoration Act (RFRA). Congress sought to justify RFRA's regulation of states by its Fourteenth Amendment power to enforce the First Amendment. But, the Supreme Court held, "Congress had exceeded" its

authority to "enforce constitutional rights pursuant to § 5 of the Fourteenth Amendment" when it endeavored to "defin[e] those rights instead of simply enforcing them." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1236 (11th Cir. 2004) (emphasis omitted) (discussing *City of Boerne v. Flores*, 521 U.S. 507 (1997)). Because, in the Supreme Court's view, "RFRA contradict[ed] vital principles necessary to maintain separation of powers and the federal balance," the Court held that RFRA, as applied to the states, was unconstitutional. *City of Boerne*, 521 U.S. at 536.

After *City of Boerne*, Congress passed RLUIPA. RLUIPA, "enacted under Congress's Commerce and Spending Clause powers, imposes the same general test as RFRA but on a more limited category of governmental actions." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 (2014).[2] By enacting RLUIPA, Congress directed federal courts to scrutinize municipal land-use regulations that function to exclude disfavored religious groups like TOL Christian Schools. "RLUIPA's land-use sections provide important protections for the religious freedom of persons, places of worship, *religious schools*, and other religious assemblies and institutions." U.S. Dep't of Justice, *supra* at 4 (emphasis added).

RLUIPA protects land use as religious exercise in several ways. For example, it limits government's ability to impose a land-use regulation "that imposes a substantial burden on" religious exercise. 42 U.S.C. § 2000cc(a)(1). In addition, RLUIPA prohibits land-use regulation that "discriminates against any assembly or institution on the basis of religion," *id.* § 2000cc(b)(2), or "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction," *id.* § 2000cc(b)(3)(B). The RLUIPA provision at issue here, often called the Equal Terms Provision, provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." *Id.* § 2000cc(b)(1).

---

[2]Unlike RFRA, "RLUIPA, in an obvious effort to effect a complete separation from First Amendment case law," *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761–62, omitted "the reference to the First Amendment," *id.* at 2762, that was present in RFRA. In addition, RLUIPA provides that it "shall be construed in favor of a broad protection of religious exercise . . . ." 42 U.S.C. § 2000cc-3(g). The Court has acknowledged that the phrase "'exercise of religion,' as it appears in RLUIPA, must be interpreted broadly . . . ." *Hobby Lobby*, 134 S. Ct. at 2762 n.5.

B

All of our sister circuits that have interpreted the Equal Terms Provision have glossed the statutory language in a way that allows defendant governments some safe harbor for permissible land-use regulation. But they disagree about the "nonreligious assembly or institution" whose treatment by the government should be compared with the government's treatment of a religious assembly or institution.

The Eleventh Circuit's test in *Midrash Sephardi, Inc. v. Town of Surfside* is the oldest and most plaintiff-friendly. 366 F.3d 1214 (11th Cir. 2004). The Eleventh Circuit begins with a literal reading of the Equal Terms Provision's language: A valid comparator could be *any* nonreligious assembly or institution. It is this understanding of what is a comparator, i.e., which secular land users are similarly situated to a religious assembly or institution, that is so plaintiff-friendly. To compensate, and as an off-setting consideration, the Eleventh Circuit borrows from the Supreme Court's Free Exercise jurisprudence a strict-scrutiny analysis: a land-use regulation does not violate the Equal Terms Provision if it is *narrowly tailored* to further a *compelling* government interest.

Other circuits, by contrast, require that a comparator be "similarly situated" to the plaintiff religious assembly or institution with regard to the regulation at issue or to its purpose. For instance, the Third Circuit restricts comparison to "secular assemblies or institutions that are similarly situated [to the religious assembly] *as to the regulatory purpose*." *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 266 (3d Cir. 2007). The Second Circuit compares the plaintiff religious assembly to a nonreligious assembly "similarly situated for all functional intents and purposes of the regulation." *Elijah Grp., Inc. v. City of Leon Valley*, 643 F.3d 419, 423 (5th Cir. 2011) (internal quotation marks omitted) (discussing *Third Church of Christ, Scientist, of N.Y.C. v. City of New York*, 626 F.3d 667 (2d Cir. 2010)); *see also Elijah*

*Grp., Inc.*, 643 F.3d at 422–24 (describing how the various tests using "similarly situated" language differ, while declining to choose among them).**3**

We need not definitively choose among the various tests used by other circuits in order to resolve this case. Granting summary judgment to the government is erroneous under any test, because "summary judgment must be denied in a proceeding for equitable relief . . . where genuine issues of material fact exist." *Hasan v. Clevetrust Realty Inv'rs*, 729 F.2d 372, 374 (6th Cir. 1984); *cf. Hess v. Schlesinger*, 486 F.2d 1311, 1313 (D.C. Cir. 1973) (holding that, when a plaintiff seeking an injunction raises a genuine issue of fact material to the defendant government's claim regarding its justification for a policy, summary judgment is inappropriate); *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581 (S.D.N.Y. 1982) (holding that, where defendant's assertion depends on proof to be offered at trial, summary judgment is inappropriate).

## III

Do TOL Christian Schools and the government genuinely dispute whether the government treated more favorably any other assembly or institution that, like TOL Christian Schools, failed to maximize the government's income? The government's current zoning law allows (in fact, encourages) nonreligious assemblies or institutions to use 5000 Arlington Centre

---

**3**The Seventh Circuit observed that the Third Circuit's "use of 'regulatory purpose' as a guide to interpretation" presents several practical problems. *River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367, 371 (7th Cir. 2010) (en banc). The regulatory-purpose test:

(1) "invites speculation concerning the reason behind the exclusion of churches";

(2) "invites self-serving testimony by zoning officials and hired expert witnesses";

(3) "facilitates zoning classifications thinly disguised as neutral but actually systematically unfavorable to churches"; and

(4) "makes the meaning of 'equal terms' in a federal statute depend on the intentions of local government officials."

*Ibid.*

Nonetheless, the Seventh Circuit adopted a test closer to that of the Second, Third, and Fifth Circuits than that of the Eleventh, although it "shift[ed] focus from regulatory *purpose* to accepted zoning *criteria*." *Ibid.*; *see also Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1172–73 (9th Cir. 2011) (following the Seventh Circuit's "accepted zoning criteria" test).

Boulevard: businesses most obviously, but also nonprofit organizations such as hospitals, outpatient care centers, and daycare centers.[4]

The government does not deny that the UDO would allow these other assemblies or institutions to use 5000 Arlington Centre Boulevard.[5]  So the remaining question is whether these other assemblies or institutions, treated more favorably, are similarly situated.  TOL Christian Schools has pled facts sufficient to allege that at least some of these assemblies or institutions are situated, relative to the government's regulatory purpose, similarly to TOL Christian Schools, i.e., they would fail to maximize income-tax revenue.  *See* Verified Compl. ¶¶ 60–65 (identifying permitted uses of child day care centers, hotels/motels, hospitals, outpatient surgery centers, and business and professional offices).  These allegations create a genuine issue of fact as to whether the government treats more favorably assemblies or institutions similarly situated with respect to maximizing revenue, unless the government can demonstrate that no assemblies or institutions *could be* similarly situated.

The religious land use that TOL Christian Schools proposes is, we assume without deciding, deleterious to the purpose of the regulation at issue (which we assume to be increasing income-tax revenue).  But the nonreligious uses that the government concedes it would allow seem to be similarly situated to the regulation.  Indeed, the comparisons that the government invites seem to compel the opposite conclusion, even on casual review.

For instance, the government suggested at oral argument that it would prefer that 5000 Arlington Centre Boulevard be used for an ambulatory care center or outpatient surgery

---

[4]The UDO formerly allowed daycares as permitted uses in ORC Office and Residential District.  Upper Arlington chose, during the pendency of the litigation, to exclude daycares from the ORC District.  *See* Ordinance 52-2011.  But "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 583 (6th Cir. 2012) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000)); *see also Ohio Citizen Action*, 671 F.3d at 583 (observing that "the defendant bears 'the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur" (quoting *Friends of the Earth*, 528 U.S. at 190)).  Here, the removal of daycares from the zone, absent an injunction that would prevent their permitting, would not remedy the alleged problem; Upper Arlington always could amend the UDO once again to allow daycares in the ORC district.  *See* Gibson Depo., R. 55 at 66 (explicitly admitting that Upper Arlington could return to the earlier UDO at any time).

[5]A government's small size or general anti-development regulations or political culture cannot protect it from valid RLUIPA claims on motions for summary judgment:  A government's regulatory system that provides for unequal treatment violates RLUIPA even if no practical comparator has arisen.

center.  But we cannot *assume* as a fact, and the government certainly has offered no evidence to show, that an ambulatory care center (or an outpatient surgery center, or a data and call center, or office space for a not-for-profit organization, or a daycare) would employ higher-income workers than TOL Christian Schools would (or result in less traffic or even in less outdoor noise, each an alternative rationale at one point proffered by the government for refusing TOL Christian Schools's application).  The dissent engages in a vigorous factual analysis of these factors, but they are genuine issues of material fact that cannot be resolved on summary judgment.  As such, the district court's grant of summary judgment to the government was error.

We remand to the court below to answer remaining questions of fact: Are there nonreligious assemblies or institutions to which the court should compare Tree of Life Christian Schools because they would fail to maximize income-tax revenue, and if so, would those assemblies or institutions be treated equally to TOL Christian Schools?

IV

Our obligation is to apply the statute enacted by Congress.  We cannot contort its meaning.  Under any of our sister circuits' tests, RLUIPA does not allow the government to treat more favorably land uses that, like TOL Christian Schools, fail to maximize the government's income-tax revenue.  The standard for judgment is objective:  Are other assemblies similarly situated or are they not?  It is not for us to decide this question, because the question is factual.  Taking that position does not imply our acceptance of the Eleventh Circuit's strict-scrutiny standard.  Nor does it imply intermediate scrutiny or rational basis.  These standards of legal review and their attendant arguments do not apply at this stage in the litigation.

For instance, the government claims that TOL Christian Schools can locate elsewhere in 95% of the land that exists in Upper Arlington.  That claim, perhaps relevant to the intermediate-scrutiny defense of "other means," has no application here.  The Equal Terms Provision forbids a locality from discriminating against religious institutions and assemblies, regardless of time, place, and manner.  In other words, it is not a defense that a government discriminates against

religious assemblies and institutions only in part, rather than all, of its jurisdiction.[6]  Even the government's proffered rational basis for its regulation—we want A, we think land use B leads to A, thus we regulate to privilege land use B—does not satisfy RLUIPA's test.

Finally, we observe that the government could ensure commercial use of the property at issue without violating the federal statute.[7]  Using eminent domain, Upper Arlington could force TOL Christian Schools to sell the land to the government, and sell the land to a buyer that the government thinks offers superior economic benefits.  *See Kelo v. City of New London*, 545 U.S. 469 (2005); *see also* Christopher Serkin & Nelson Tebbe, *Condemning Religion: RLUIPA and the Politics of Eminent Domain*, 85 Notre Dame L. Rev. 1, 53 (2009) (arguing that eminent domain "provides local governments with an escape hatch to avoid the most severe applications of RLUIPA's zoning provisions").  But the city has not committed government funds to the theory that a traditional commercial office tenant—as yet unidentified—both could be attracted to use the land and also, if attracted, would increase tax revenues.  Instead, they have placed the cost on TOL Christian Schools—perhaps to save the upfront cost of compensating an exercise of eminent domain, perhaps because there is no market for office space in Upper Arlington, and perhaps to exclude an unfamiliar or disfavored religious assembly.

V

TOL Christian Schools claims that Upper Arlington has violated its *constitutional* rights to equal protection and free exercise.[8]  These claims are incorrect.  Because facially neutral statutes such as the UDO might survive rational-basis review under the Equal Protection Clause

---

[6]Just because *regulations* do not prevent a particular and protected use does not mean that such a use is factually possible.  Here, the government points to the zoning of much of its land for residential use, where it allows owners to use land for schooling, religious or otherwise.  But it may be functionally impossible for a school such as TOL Christian Schools to purchase and amalgamate such land, which could belong to many private owners.

[7]We reiterate that we assume without deciding that Upper Arlington's stated policy goal—regulating the use of land in order to maximize income-tax revenue—both reflects the essence of the statutory language and also presents no legal problems by itself, although some courts have found regulations of land use solely for the purpose of maximizing the local-government's tax revenues to be arbitrary and unreasonable.  *See, e.g.*, *Mindel v. Twp. Council of Twp. of Franklin*, 400 A.2d 1244 (N.J. Super. Ct. Law Div. 1979).  We hold only that the regulatory scheme employed to affect that goal *may* violate RLUIPA and the facts disputed are material to the question of whether there has been a violation.

[8]TOL Christian Schools initially complained of violations of the Ohio Constitution, *see* Verified Compl. ¶¶ 167–73, but did not brief the issue on appeal, so we do not consider it.

and Free Exercise Clause,[9] Congress established enhanced protections for religious assemblies against land-use regulations.  We apply RLUIPA by its statutory terms and find a genuine issue of material fact as to its applicability.

In conclusion, because we hold that there is a genuine issue of material fact as to the applicability of RLUIPA's Equal Terms Provision, we REVERSE the judgment of the district court, and REMAND for further proceedings.

---

[9]*See Emp't Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990).

---

### CONCURRING IN PART AND DISSENTING IN PART

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. I agree with my colleagues' disposition of the equal protection and free exercise claims, but respectfully dissent from the analysis and disposition of the as-applied equal-terms RLUIPA challenge. Whether the district court took too restrictive a view when it looked *solely* to secular schools as comparators is an open question in this Circuit. But assuming for argument's sake that the district court erred in its choice of standard, the City of Upper Arlington is still entitled to summary judgment because Tree of Life Christian Schools did not identify a secular comparator similarly situated with respect to the relevant zoning criteria that received more favorable treatment under the challenged Unified Development Ordinance. Dist. Ct. Op., PID 2744 (citing *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1311 (11th Cir. 2006)). Nor has it identified or argued that there are questions of fact that bear on this issue. I would affirm the grant of summary judgment to the City.

### I.

Upper Arlington (the City) is 10-miles square and almost 99% of its land is developed. Schools and churches are permitted in residential zones, which comprise 95% of developed land within the City.[1] Commercially-zoned districts comprise 4.7% of the land and include areas zoned Office and Research Center District (ORC), which constitute a minuscule 1.1% of the land.[2] Churches are permitted as conditional uses in ORC-zoned areas but *all* schools are prohibited.[3]

---

[1]*See* Land Use Map, PID 149, and District Court Opinion, PID 2743.

[2]The City is approximately 6,336 acres and ORC-zoned districts occupy only 67 acres.

[3]Schools are prohibited in the ORC and all other commercially-zoned districts. The other commercial districts are the Office District (O), Neighborhood Business District (B-1), Community Business District (B-2), Conditional Business District (B-3), and Planned Shopping Center District (PB-3). Churches are permitted or conditional uses in commercial districts B-1, B-2, PB-3, O, and ORC.

The City's 2001 Master Plan, developed and implemented after lengthy study and seventeen public participation meetings at which residents gave input, notes that due to capital shortfalls,

> in order for the City to maintain its existing level of facilities and services, and **in order to provide for future capital needs**, it is critical for the City to enhance its revenues. **The revenue generated per acre from commercial use far exceeds the revenue provided by residential use.** In order to maximize revenues, the City was directed in the Master Plan to create opportunities for office development that emphasize high-paying jobs . . . .

PID 2731-32 (emphasis added). In keeping with the Master Plan, the City's Unified Development Ordinance (UDO) describes the purposes of ORC zoning:

> to allow offices and research facilities that will contribute to the City's physical pattern of planned, healthy, safe, and attractive neighborhoods. The ORC district should also provide job opportunities and services to residents and contribute to the City's economic stability. Permitted uses generally include, but are not limited to, business and professional offices, research and development, book and periodical publishing, insurance carriers, corporate data centers, survey research firms, and outpatient surgery centers.

PID 1131/UDO art. § 5.04.

Against this backdrop, Tree of Life Christian Schools (TOLCS), a private religious school currently serving approximately 660 K-through-12 students and employing around 150 persons,[4] contracted in October 2009 to purchase from Time Warner the largest office complex in the City, 5000-05 Arlington Centre Boulevard—a 15.8-acre, 254,000 square-foot two-building center in an ORC-zoned district.[5]

Although the City advised TOLCS months before it entered into the purchase agreement with Time Warner that schools are neither permitted nor conditional uses in the ORC and that site-specific rezoning would be required in order to operate a school there, TOLCS applied to the

---

[4]TOLCS asserted that it employed 150 persons, and the district court used that figure in its opinion. Subsequently, however, TOLCS's counsel represented to the City's Board of Zoning Appeals that TOLCS employs 100 persons. PID 2227, 2635/supplemental record filed with leave following this court's remand.

[5]The property TOLCS purchased has been zoned commercial since 1970. Time Warner purchased the property in 2006 for $23 million dollars. TOLCS purchased the office complex from Time Warner for $6.5 million dollars.

City for a conditional use permit, requesting to use the office complex "for a place of worship, church and residential, to the extent that residential includes a private school." After the City Council denied a conditional use permit, TOLCS sought to amend Table 5 of the UDO to allow private religious schools (but not other schools) as permitted uses in the ORC, and to change churches from conditional to permitted uses. The City Council denied TOLCS's request for reasons including that amending the UDO to allow only private religious schools in ORC-zoned areas would "raise a facial First Amendment problem." PID 2463, 2732.

The Time Warner-TOLCS purchase agreement contained a rezoning contingency period; nonetheless, TOLCS closed on the property on August 11, 2010, without seeking site-specific rezoning. TOLCS filed this action in January 2011.

In October 2013, TOLCS sought, for the first time, site-specific rezoning of its office complex from ORC to R-Sd (residential suburban).[6] The City's Board of Zoning and Planning (BZAP) reviewed TOLCS's rezoning request, after which the City Council considered it at three meetings in November and December 2013. By that point, this action had been pending for well over two years, the parties had taken some discovery, and the administrative record included evaluations of TOLCS's prior requests.

City Staff reported to the City Council that the office complex now owned by TOLCS typically generated three types of income for the City: personal income tax on wages earned by employees (2%), entity-level income tax on net profits of company(ies) located there (2%), and property tax. The City's Director of Finance Catherine Armstrong had previously testified that TOLCS's office complex "is our largest commercial site and the income tax generated from this property has always been significant." PID 1285, 1294. In 2001, the office complex generated 29% of the City's income tax revenues; over $3,000,000. In 2005, the office complex generated revenue from personal and entity-level income taxes totaling $1,216,732, which decreased to

---

[6]The purpose of R-S residential zoning

is to allow single-family dwellings in low-density residential neighborhoods. This district is further subdivided into four subdistricts R-Sa, R-Sb, R-Sc, and R-Sd, differing primarily in required lot area and yard space. Net densities range from 0.33 dwelling units per acre in the R-Sa District to 2 dwellings per acre in the R-Sd District. Permitted uses generally include, but are not limited to, single-family residential, institutional, cultural, recreation, and day care.

PID 2524/UDO § 5.02(A)(1).

$20,269 in 2009, the year Time Warner vacated the office complex. Property tax revenue to the City from the office complex increased from $584,917 in 2005 to $646,219 in 2009.

In 2010, TOLCS's 150 or so employees combined earned $2,321,211.99,[7] which would translate to approximately $46,424 in personal income tax to the City, or about 1/10[th] the income tax (personal and entity-level) Time Warner generated in 2006.

Rezoning would also substantially change the character of the ORC district by allowing single family homes and schools in an office and research zone, eliminating over 20% of the City's existing ORC-zoned land, and permitting future owners to demolish existing buildings, which would further reduce revenue to the City. PID 2614/City Staff Report to City Council 11/23/2013.

In addition to the financial aspects of the proposed rezoning, staff addressed use concerns:

> A K-12 school has inherent characteristics which can be intrusive and destructive to an office park. Traffic, including school bus circulation, loading and unloading, can be challenging for an area to accommodate. A large number of young drivers and parents arriving and departing at similar (peak) times can tax the roadways and related infra-structure, reducing the level of service for the signalized intersections. After-school activities such as band and theater productions can also bring large numbers of parents and students to the area, often necessitating overflow parking demands. Outdoor events, such as band practice, can create noise impact for office workers who are attempting to do business and/or serve clients.

PID 2490.

The City Attorney reported to the City Council that TOLCS met none of the seven standards the UDO requires for rezoning (quoted below, followed by the City Attorney's remarks in italics).

> 1.      That the zoning district classification and use of the land will not materially endanger the public health or safety;

---

[7]TOLCS Superintendent Dr. Todd Marrah also projected that if TOCLS occupies the office complex, the student population could increase to 1300 and employees to 250, but he was not asked to project total employee wages should personnel exceed 150.

[Finance Director Armstrong] testified in her deposition that the City had a decline in income in 2007, 2008, and 2009. The income in 2010 was comparable to the 2009 income and there was an increase in income in 2011. The City had a balanced budget during those years because appropriations were not requested that would exceed estimated revenues.

The elimination of the estate tax and reductions in state funding further reduces available revenues and places additional stress on a tight budget situation. In order to continue to provide necessary services to the residents, the City needs to maximize revenues. Rezoning the Tree of Life property to residential does not maximize the revenue potential of one of the City's largest commercial office sites. The rezoning would permit a future owner to demolish the office buildings/school and build single family houses which would further reduce revenues.

2. That the proposed zoning district classification and use of the land is reasonably necessary for the public health or general welfare, such as by enhancing the successful operation of the surrounding area in its basic community function or by providing an essential service to the community or region;

The issue is not whether quality schools are necessary or if Tree of Life will be a good neighbor, but whether the City needs more residentially zoned land. Approximately 90% of the City . . . is already zoned for residential uses, including schools. Tree of Life has failed to establish the necessity for more residentially zoned land.

3. That the proposed zoning district classification and use of the land will not substantially injure the value of the abutting property;

Tree of Life's argument concerning St. Andrews and Wellington [both schools] are an "apples to oranges" comparison. Both . . . are located in purely residential districts that specifically contemplate schools. Tree of Life proposes to put a school in an office and retail district that does not contemplate such a use. Abutting commercial owners could not have anticipated such a school use possible when they acquired their properties.

4. That the proposed zoning district classification and use of the land **will be in harmony with the scale, bulk, coverage, density, and character** of the area the neighborhood [sic] in which it is located;

The AOL office workers were in harmony with the commercial character of the Henderson Road corridor. Residential uses, including 600 students attending a K-12 school, are not . . .

5. That the proposed zoning district classification and use of the land will **generally conform with the Master Plan and other official plans of the City**;

Rezoning to eliminate commercially zoned property is contrary to the Master Plan [which] seeks to "Enhance the City's revenue sources" and "Expand the amount of office space in the City".[sic]　Tree of Life is asking Council to eliminate over 20% of the City's existing ORC zoned land.　Commercial office comprises only 1.1 percent of the City's total land area.　Zoning should be based on a comprehensive plan taking into consideration the best interests of the community.　It should not be done on a piecemeal based on the desires of an individual property owner.

6.　　That the proposed zoning district classification and use of the land are **appropriately located with respect to transportation facilities**, utilities, fire and police protection, waste disposal, and similar characteristics; and

The revised traffic study is still deficient in addressing the change in traffic conditions resulting from a school.　Staff is also concerned whether adequate study has been made if the property were redeveloped for residential or other uses permitted in the R-Sd district.

7.　　That the proposed zoning district classification and use of the land **will not cause undue traffic congestion or create a traffic hazard.**

It is questionable whether Tree of Life's promise that no athletic events or evening activities would be held at the site would be enforceable.

UDO § 4.04(c) (emphasis added)/PID 2391; 12/9/13 City Council Mtg. Minutes/PID 2578-79.

The City Council denied TOLCS's rezoning request, which prompted the parties to file cross-motions for summary judgment, the disposition of which led to this appeal.

**II.**

RLUIPA's equal terms provision provides:　"No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less then equal terms with a nonreligious assembly or institution."　42 U.S.C. § 2000cc(b)(1).　This statutory command . . . allows courts to determine whether a particular system of classifications adopted by a city *subtly or covertly departs from requirements of neutrality and general applicability.'"* *Primera Iglesia*, 450 F.3d at 1307 (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1232 (11th Cir. 2004) (emphasis added)).

To establish a prima facie case under the equal terms provision, a plaintiff has the burden of showing that 1) it is a religious assembly or institution, 2) subject to a land use regulation, that 3) treats it on less than equal terms, with 4) a nonreligious assembly or institution.　*Primera*

*Iglesia*, 450 F.3d at 1307. It is TOLCS's burden to identify a similar secular comparator treated more favorably under the UDO. *Id.* at 1313–14 (Noting that "without identifying a similarly situated nonreligious comparator that received favorable treatment, Primera failed to establish a prima facie Equal Terms violation.").

## A.

As TOLCS acknowledges on appeal, the circuits generally are in accord "that valid comparators for RLUIPA purposes are secular assemblies or institutions that impact the accepted zoning criteria, or regulatory purpose, to the same or greater extent than the religious assembly or institution at issue." Reply Br. 8. *See Eagle Cove Camp & Conference Ctr. Inc. v. Town of Woodboro, Wi.*, 734 F.3d 673, 683 (7th Cir. 2013) ("In determining whether a claim exists under the equal terms provision, we look to the zoning criteria rather than the purpose behind the land use regulation") (citing *River of Life Kingdom Ministries v. Village of Hazel Crest, Ill.*, 611 F.3d 367, 371 (7th Cir. 2010) (en banc)); *Centro Familiar Cristiano v. Village of Yuma*, 651 F.3d 1163 (9th Cir. 2011) (observing that "our analysis is about the same as the Third Circuit's: we look to see if the church is 'similarly situated as to the regulatory purpose'" or to the Seventh Circuit's refinement of the regulatory purpose test "to avoid inappropriate subjectivity by requiring equality with respect to 'accepted zoning criteria,' such as parking, vehicular traffic, and generation of tax revenue."); *Third Church of Christ v. City of New York*, 626 F.3d 667, 670 (2d Cir. 2010) (church and two secular institutions were similarly situated "for all functional intents and purposes relevant here."); *River of Life Kingdom Ministries*, 611 F.3d at 371 ("The problems . . . with the 3d Circuit's test can be solved by a shift of focus from regulatory *purpose* to accepted zoning *criteria*. 'Purpose' is subjective and manipulable . . . 'Regulatory criteria' are objective–and it is federal judges who will apply the criteria to resolve the issue."); *Lighthouse Inst. for Evangelism*, 510 F.3d 253, 266 (3d Cir. 2007) (comparator must be similarly situated ). *But see Elijah Group v. City of Leon Valley*, 643 F.3d 419, 424 (5th Cir. 2011) (declining to adopt the test of any other circuit and holding that RLUIPA's equal terms provision "must be measured by the ordinance itself and the criteria by which it treats institutions differently."), and *Primera Iglesia*, 450 F.3d 1295 (11th Cir. 2011) (comparators are determined based on whether challenged ordinance is facially neutral or facially discriminatory; if the latter, any nonreligious

assembly or institution can be a comparator and strict scrutiny applies. If the challenged ordinance is facially neutral, however, claims are classified as either 1) those that challenge ordinances of general applicability but that nonetheless target religion through a religious gerrymander, or 2) those that challenge discriminatory application.)[8]

The parties did not attempt to resolve the legal standard below; nor do they do so on appeal. Each maintains that it prevails under any of the standards. Further, TOLCS does not challenge the City's zoning criteria; rather, it argues that it is treated unfavorably compared to similarly situated comparators with respect to those criteria. Finally, neither party argued to the district court, and neither argues on appeal, that there are questions of fact with regard to the various uses or zoning criteria that preclude summary judgment.

## B. Similarly Situated Comparators

TOLCS acknowledged below that secular schools are proper comparators, and does not dispute the district court's determination that the UDO treats *all* schools equally, i.e., prohibits *all* schools in ORC districts. It also acknowledges that churches are permitted as conditional uses in ORC districts. TOLCS's argument is that while secular schools are proper comparators, they are not the only proper comparators, and the district court erred in not considering day-care centers, charitable office uses, and hospitals as additional comparators, which, it asserts, are similarly situated with respect to the zoning criteria but treated more favorably.[9]

---

[8]The majority's references to the Eleventh Circuit's test for determining comparators, Maj. Op. at 3 and 7, are unnecessary given that TOLCS does not argue for application of that test. TOLCS simply argues that, contrary to the district court's determination that only secular schools are proper comparators to TOLCS, none of the circuits (including the Eleventh Circuit) require that secular comparators be *identical* to the religious plaintiff, only similarly situated. Appellant Br. 22, 24.

[9]TOLCS asserts that the "fatal flaw" in the City's attempts to distinguish it from day-care centers, charitable office uses, and hospitals, is that

> the City's desire to maximize tax revenue from the use of Tree of Life's property translates to nothing more than a vague set of hopes and dreams. The City . . . created the ORC district in the hopes that it would generate tax revenue for the City but it drafted the district requirements in an imprecise, overly broad, and impractical way that allows for uses in the ORC district that undercut its stated purpose and criteria to the same or greater extent than Tree of Life's use.

Reply Br. 15.

In September 2011, after TOLCS brought the instant action, the City Council passed an ordinance amending the UDO to remove daycare centers from the category of permitted uses and designate them as prohibited uses in the ORC district.  TOLCS asserts that the district court erred in not considering daycares as a valid comparator because its damages claim cannot be mooted by the City's voluntary cessation of unlawful conduct, and because the amended UDO still violates RLUIPA by allowing hospitals and non-profit uses in the ORC district.  The City asserts that daycare centers are not a proper comparator because they are no longer allowed, but even assuming they are, they are not similarly situated with respect to the relevant zoning criteria.  We turn to that question.

1.     **Child Day-Care Centers**

The UDO defines "Child Day-Care" as:

administering to the needs of infants, toddlers, preschool children and school children outside of school hours by persons other than their parents or guardians, custodians or relatives by blood, marriage, adoption, for any part of the 24 hour day in a place or residence other than the child's own home.

PID 1025.  Child Day Care may be provided at a permanent residence or other location:

**Child Day-Care Center and Type A Home**:  means any place in which child day-care is provided, with or without compensation, *for 13 or more children at one time*, or any place that is not the permanent residence of the licensee or administrator in which child day-care is provided, with or without compensation, *for seven to 12 children at one time*.  In counting children for the purpose of this ordinance, any children under six years of age who are related to a licensee, administrator, or employee and who are on the premises of the center shall be counted.

**Child Day-Care Home and Type B Home**:  means *a permanent residence* of the provider in which child day-care services are provided for *one to six children at one time* and in which no more than three children may be under two years of age at one time.  In counting children for the purpose of this ordinance, any children under six years of age who are related to the provider and who are on the premises of the Type B home shall be counted.  A Type B family day-care home does not include a residence in which the needs of children are administered to, if all of the children are siblings of the same immediate family and the residence is the home of the siblings.

PID 1026.

TOLCS's reliance on the testimony of Senior Planning Officer Gibson and Robert Weiler, one of the City's experts, to support that child day-care centers are similarly situated to its 660-student school because *some* centers would not maximize tax revenue to the City, is unavailing.   Both Gibson and Weiler testified or averred that, *in keeping with the UDO's description of ORC zoning as including "services,"* day-care centers were permitted as *ancillary*, complementary services in support of primary uses like offices, not because they generate significant tax revenue for the City in and of themselves.  Similarly, coffee and barber shops are permitted uses in the ORC as ancillary uses.[10]

> Weiler explained:
>
> Although daycares are not significant revenue producers, daycares compliment [sic] a commercial use by providing child supervision for employees in the area. In addition, the surveyed daycares in the city of Upper Arlington serve only between 40 to 130 children.  Additionally, having built and owned daycares including a current interest in a daycare located on Sawmill Road in Columbus, few daycares are in excess of 10,000 SF as compared to [] school[s] that are routinely substantially larger.

PID 1765.   A 600-student K-12 school is not an ancillary service for the convenience and support of the employees who work in the area's offices and commercial establishments

TOLCS also asserts that day-care centers are proper comparators because *some* are *large* and licensed to accept as many as 1,000 children.  Appellant Br. 12–13, n.4.  It relies on two

---

[10]UDO § 5.01(B) provides that only uses designated as permitted shall be allowed as a matter of right in a zoning district and any not so designated shall be prohibited . . .  PID 2008.  Schools are not designated as permitted in the ORC and are thus prohibited.

ORC uses designated as permitted include banks, business and professional offices, corporate data centers, hotels and motels, hospitals, insurance carriers, outpatient surgery centers, periodicals and book publishing, research and development in information or medical technologies, survey research firms, barber shops and beauty parlors, and coffee shops.

Expressly prohibited ORC uses include adult book stores, adult motion-picture theaters, amusement arcades, animal boarding, automotive service establishments, bowling alleys, candy stores, pool or billiard rooms, department stores, drug stores, dry-cleaning shops, fast-food restaurants, funeral homes, grocery and supermarket stores, laundromats, liquor stores, massage parlors, meat and fruit markets, motor-vehicle wash facilities, movie theaters, night clubs, pharmacies, publishing, radio and TV studios, skating rinks, soda fountains, variety stores, and tattoo parlor or body-piercing studios.

exhibits, the first[11] of which lists six day-care centers located in Arizona, Missouri, Kansas, and South Carolina that "care for children outside of school hours" and have capacity to serve from 416 to 965 children. The second exhibit consists of charts listing the twenty-five largest day-care centers in Ohio, which have capacities to serve from 282 to 467 children. But TOLCS points to no day-care facilities in the City or the immediate area. The size of the six day-care centers in four states far from Ohio seems no more relevant than the size of day-care centers in Europe. Similarly, the list of the largest day-care centers in Ohio provides no information about the communities they serve, other than their names. The City is entitled to devise a master plan and ordinances that take into account the size of the community and its actual experience with commercial and other users of land.

Additionally, most of the twenty-five largest Ohio day-care centers TOLCS offered are named either "school," "learning center," "child development center," "head start," or "children's center," suggesting that the facilities provide both day-care and schooling. Assuming these centers would have qualified as child day-care centers permitted under the UDO, TOLCS failed to present evidence that any day-care comparator seeking to locate in the City's ORC would serve anywhere near the 660 students TOLCS serves (it is uncontroverted that the largest day-care center in the City served 130 children). TOLCS's proposed 660-student K-through-12 school would constitute a much more intensive use than a day-care center by virtue of its size, the age range of its students, and the traffic and noise it would generate during peak times and during after-school and weekend activities. In sum, TOLCS failed to show that the day-care comparators are similarly situated with respect to the accepted zoning criteria, and are no more consistent with office use, research use, supporting commercial activities, *and supporting, ancillary, services* than TOLCS.

### 2.    **Hospitals**

TOLCS asserts that hospitals are proper comparators because *some* hospitals in the Columbus area are nonprofit and do not generate property tax for the City, Appellant Br. 13, 36, and therefore inclusion of hospitals in the ORC undermines the City's objective of generating

---

[11]*See* PID 115, the declaration of a legal assistant at the Alliance Defense Fund who avers that she conducted research regarding the size of day-care centers across the country.

revenue. But TOLCS overlooks that income tax, not property tax, is the largest source of revenue for the City, and hospitals typically employ many highly-skilled and educated professionals who tend to command large salaries. Thus, that some hospitals are non-profit and do not pay real-estate taxes is unimportant when compared to the revenue non-profit hospitals generate in income taxes. Appellee Br. 25.

The majority observes that "we cannot *assume* as a fact, and the government certainly has offered no evidence to show, that an ambulatory care center (or an outpatient surgery center . . . ) . . . would employ higher-income workers" than TOLCS. Maj. Op. at 10. I disagree for two reasons. First, the majority discounts the City's institutional knowledge of which land uses generate most revenue for the City. Second, it is TOLCS's burden to come forward with a similarly situated comparator, *Primera Iglesia*, 450 F.3d at 311, and TOLCS offered no evidence that it would generate comparable to that generated by a hospital or medical center, nonprofit or not. Further, TOLCS does not argue that questions of fact should have precluded summary judgment or that we should remand for further factual development.

### 3.    **Charitable Offices**

Finally, TOLCS asserts that charitable offices generate no property tax and that nothing in the UDO would preclude a charitable organization from staffing an office, say, with only twenty employees, which would not generate much income tax for the City. Appellant Br. 13, 36. But the density of non-profit office use and the salaries of non-profit professionals are more compatible with the ORC's permitted uses and economic goals than a K-12 school and its accompanying noise and traffic.

## IV.

In sum, the majority requires not equal treatment, but special treatment, for the proposed religious use. *See, e.g., Primera Iglesia*, 450 F.3d at 1313–14 (citing *Midrash*, 366 F.3d at 1231–32, and *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir. 2003) ("[N]o . . . free pass for religious land uses masquerades among the legitimate protections RLUIPA affords to religious exercise.")) I would affirm the grant of summary judgment to Upper Arlington on the basis that TOLCS failed to present a secular comparator that is similarly

situated with respect to the relevant zoning criteria.[12]  *See, e.g., Eagle Cove Camp & Conference Ctr. Inc.*, 734 F.3d at 683; *Centro Familiar Cristiano*, 651 F.3d at 1172–73.

---

[12]I further observe that the majority's discussion of eminent domain is inapposite.  TOLCS purchased the property with knowledge of the existing zoning, and the City has no obligation to compensate TOLCS as a condition of its enforcement of its valid zoning regulations.  TOLCS has not shown that there are no feasible uses for the property.  Indeed, it derives income by leasing out a portion of the space.